ROBBINS GELLER RUDMAN
   & DOWD LLP
STEPHEN R. ASTLEY (SBN 227619 *activation pending*)
ANDREW T. REES
RENE A. GONZALEZ
SCOTT I. DION
ALEX KAPLAN
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com
akaplan@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

[Additional counsel appear in signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SEAN DEENEY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL, LLC, and ROBINHOOD SECURITIES, LLC, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> CLASS ACTION COMPLAINT <br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

By and through his undersigned counsel, Sean Deeney ("Plaintiff") brings this class action against defendant Robinhood Markets, Inc. and its wholly owned subsidiaries, defendant Robinhood Financial, LLC and defendant Robinhood Securities, LLC (collectively, "Robinhood" or "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Defendants with the United States Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants and the SEC; and (d) news articles, websites, and other publicly available information concerning Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Robinhood's unlawful conduct related to its IntraFi Network Deposit f/k/a Insured Network Deposit cash sweep program ("Sweep Program").  Under the Sweep Program, Robinhood automatically sweeps idle customer cash into interest-bearing accounts at banks selected by Robinhood.

2.      The Sweep Program was highly lucrative for Robinhood but paid unreasonable, below-market yields to Robinhood customers.  Robinhood determined the yield paid to customers by securing a rate of interest to be paid by its selected banks on the sweep deposit accounts and extracting a discretionary "fee" from the interest accrued on the accounts.  In other words, Robinhood profited off of the difference (*i.e.*, "spread") between the rates offered to Robinhood by the banks and the yields passed along by Robinhood to customers.

3.      During the relevant period, Robinhood represented that the banks "pay rates above the Fed's benchmark interest rate," and that Robinhood was "committed to continuing to pass this higher interest rate on to [its customers]."  Accordingly, Robinhood assured customers that "if the Federal Reserve announces an increase to the federal funds rate," their yields "would go up" too. But as the federal funds rate skyrocketed in 2022, Robinhood decided to increase yields only for customers subscribed to Robinhood's premium subscription service, Robinhood Gold.  Between

October 2022 and May 2024, Gold members earned yields as high as 5.00% (around 33 basis points below the peak federal funds effective rate), while non-Gold members earned a stagnant yield of 1.50% (around 383 basis points below the peak federal funds effective rate). Even worse, in May 2024, Robinhood cut yields for non-Gold members to a paltry 0.01% – a yield it pays still today. Meanwhile, as depicted in the figure below, the yield paid to Gold members remained (and still remains) around 33 basis points below the federal funds rate:



ROBINHOOD SWEEP RATES VERSUS FEDERAL FUNDS EFFECTIVE RATE (MONTHLY AVG.)

4.     Robinhood's exploitation of its non-Gold customers and failure to pay them a reasonable rate of interest under the Sweep Program breached its fiduciary and contractual duties, including the implied covenant of good faith and fair dealing, and violated several state and federal laws, including the Investment Advisers Act of 1940 ("Advisers Act").

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28

1    U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the Advisers

2    Act, 15 U.S.C. §80b-1-80b-21.

3        6.    This Court has personal jurisdiction over Defendants because, during the relevant

4    time period, Robinhood Markets, Inc. was headquartered in California; Defendants had offices in

5    California, regularly transacted business in California, and intentionally availed themselves of the

6    laws and markets of California through the promotion, sale, marketing, distribution, and operation

7    of their products and services in California; and many of the acts and practices complained of

8    herein occurred in substantial part in California.

9        7.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the

10   relevant time period, Robinhood Markets, Inc. was headquartered in this District, Defendants

11   transacted business and had offices in this District, and many of the acts and practices complained

12   of herein occurred in substantial part in this District.

13       8.    In connection with the challenged conduct, Defendants, directly or indirectly, used

14   the means and instrumentalities of interstate commerce, including, but not limited to, the U.S.

15   mails and interstate telephone communications.

<strong>PARTIES</strong>

**Plaintiff**

18       9.    Plaintiff Sean Deeney is a citizen of Pennsylvania. During the relevant time period,

19   Plaintiff held a retail brokerage account with Robinhood.  Idle cash balances held in Plaintiff's

20   account were swept into the banks that Defendants selected in their discretion and earned

21   unreasonably low yields, as alleged herein.

**Defendants**

23       10.    Defendant Robinhood Markets, Inc. ("RHM") is a Delaware corporation

24   headquartered at 85 Willow Road, Menlo Park, California 94025.  RHM is a financial services

25   company, which provides access to financial markets through its mobile application ("Robinhood

26   App") and website.

27       11.    Defendant Robinhood Financial, LLC ("RHF") is a Delaware limited liability

28   company headquartered at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.

RHF is a registered broker-dealer that offers brokerage services to its nationwide client base through the Robinhood App and website.  RHF acts as its customers' agent for the establishment, maintenance, and operation of the Sweep Program.  RHF is a wholly-owned subsidiary of, and controlled by, RHM.

12.    Robinhood Securities, LLC ("RHS") is a Delaware limited liability company headquartered at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.  RHS is a registered broker-dealer that offers custody and clearing services to customers using the Robinhood App and website.  RHS acts as its customers' agent for the establishment, maintenance, and operation of the Sweep Program.  RHS is a wholly-owned subsidiary of, and controlled by, RHM.

**SUBSTANTIVE ALLEGATIONS**

**Background on Defendants' Sweep Program**

13.    Robinhood provides brokerage services to millions of customers nationwide through its eponymous Robinhood App and website. During the relevant period, these services included the IntraFi Network Deposit (f/k/a the Insured Network Deposit) automatic sweep program ("Sweep Program").

14.    Under the Sweep Program, Robinhood automatically sweeps eligible clients' idle cash balances into interest bearing deposit accounts with a network of bank partners ("Program Banks") selected at Robinhood's discretion.[1]  According to Robinhood, the Sweep Program "provides additional value to [its] brokerage customers by allowing them to earn interest on uninvested brokerage cash swept to [the Program Banks]."[2]  Funds held by the Program Banks under the Sweep Program are also insured by the Federal Deposit Insurance Corporation ("FDIC").

---

[1]    Robinhood, *Brokerage sweep program*, *Which banks are in our network?* (Jan. 15, 2025), https://robinhood.com/us/en/support/articles/deposit-sweep-program/#Whichbanksareinournetwork.

[2]    Robinhood, Annual Report (Form 10-K) (Feb. 27, 2023), https://investors.robinhood.com/static-files/ff2fa9df-0f6b-425f-8fb2-d0399c4e52f5.

15.     Robinhood offers the Sweep Program to all of its non-retirement customers, including non-retirement customers subscribed to Robinhood Gold – a paid service "offer[ing] a suite of powerful tools, data, and features designed to take [customers'] investing to the next level."[3]  For $5 monthly or $50 annually, Robinhood Gold provides, among other things, instant access to large deposits, professional research tools and market data, and, as of November 2022, a higher annual percentage yield ("APY") on idle cash balances swept under the Sweep Program.[4]

16.     The terms and conditions of the Sweep Program are set forth in the IntraFi Network Deposit Sweep Program Agreement[5] ("Sweep Agreement").  The Sweep Agreement is incorporated by reference into the Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement[6] ("Account Agreement") and the Robinhood Gold Agreement[7] ("Gold Agreement"), both of which are governed by the laws of the State of California.

17.     The Sweep Agreement provides that (a) each Deposit Account at each Program Bank "will earn the same interest rate," (b) the Program Banks "will pay the same interest rate across all customers," and (c) the rate passed along to customers (*i.e.*, the annual percentage yield, or "APY") "will be determined by the amount the Program Banks are willing to pay on the Deposit Accounts minus the fees, if any, paid to Robinhood as set forth below under 'Fees.'"[8]  Under "Fees," the Sweep Agreement states that the Program Banks "will pay Robinhood a fee equal to a percentage of the daily deposit balance in your Deposit Accounts at the Program Bank," and that

---

[3]   Robinhood, *What's Robinhood Gold?*, https://robinhood.com/us/en/support/articles/gold-overview/ (last visited May 1, 2025).

[4]   Robinhood, *Earn 3.75% Interest with Robinhood Gold* (Nov. 4, 2022), https://newsroom.aboutrobinhood.com/earn-3-75-interest-with-robinhood-gold/.

[5]   Robinhood, *IntraFi Network Deposit Sweep Program Agreement* (Dec. 26, 2024), https://cdn.robinhood.com/assets/robinhood/legal/IntraFi%20Network%20Deposit%20Sweep%20Program%20Agreement.pdf.

[6]   Robinhood, *Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement* (Jan. 31, 2025), https://cdn.robinhood.com/assets/robinhood/legal/Robinhood-Customer-Agreement.pdf.

[7]   Robinhood, *Robinhood Gold Agreement* (Nov. 27, 2024), https://cdn.robinhood.com/assets/robinhood/legal/Robinhood%20Gold%20Agreement.pdf.

[8]   Robinhood, *Sweep Program Agreement*, *supra* note 5 at 7.

1    Robinhood retains discretion to "change the fee or range of fees" and "vary the amount of the

2    change among clients."[9]  In other words, Robinhood controls the APY earned by customers in the

3    Sweep Program through the discretionary fee it takes from the interest paid on the Deposit

4    Accounts.

5          18.    Robinhood also manages and controls customers' cash in the Sweep Program,

6    including by depositing cash into, transferring cash between, and withdrawing cash from the

7    Deposit Accounts.  In addition, Robinhood brings its customers into legal relations with the

8    Program Banks by opening Deposit Accounts for customers, negotiating the rate of interest to be

9    paid on the Deposit Accounts, and agreeing to the terms on which the Program Banks pay interest

10    on customer cash.  As such, the Sweep Agreement expressly provides that Robinhood acts as the

11    agent and custodian on behalf of customers in the Sweep Program.  For example, the Sweep

12    Agreement states:

13 ·     "You will not have a direct account relationship with the Program Banks.
          Robinhood, as your agent, will establish the Deposit Accounts for you at each
14        Program Bank and make deposits to and withdrawals from the Deposit Accounts."[10]

15 ·     "Robinhood is acting as your agent in establishing the Deposit Accounts at each
          Program Bank, depositing funds into the Deposit Accounts, withdrawing funds
16        from the Deposit Accounts and transferring funds among the Deposit Accounts."[11]

17

**Robinhood Reaped Significant Benefits from Its Sweep Program to the Detriment of**
18 **Customers, Who Were Paid Unreasonably Low Interest Rates**

19          19.    The Sweep Program provided highly lucrative financial benefits to Robinhood at

20    the expense of its own customers.  As set forth above, Robinhood pays itself a discretionary fee

21    from the interest accrued on customer Deposit Accounts.  Because this discretionary fee directly

22    affects the APY passed along to customers in the Sweep Program, Robinhood operates under a

23    conflict of interest. Indeed, in its Form CRS, Robinhood acknowledges, "[T]he way we make

24

25

---

26   [9]  *Id.* at 10.

27   [10]  *Id.* at 3.

28   [11]  *Id.* at 9.

CLASS ACTION COMPLAINT                          - 6 -

money creates some conflicts with your interests."[12]  As an example, Robinhood highlights its Sweep Program, stating:

> We earn money on the difference (or spread) between the rate at which the Program Bank pays you for the cash and the fees paid to us by the Program Banks for the use of your cash, so Robinhood has an incentive to send your cash to the Program Banks, and you receive a lower yield than if the Program Banks did not pay us a fee.[13]

20.    Robinhood makes similar admissions regarding the conflict inherent in its Sweep Program in other regulatory forms and filings.  In its Form ADV Part 2A, for example, referring to the fee collected under its Sweep Program, Robinhood admits, "The fee will affect the interest clients receive under the Cash Sweep Program, as program banks adjust the interest rate paid to depositors in light of the fee."[14]  In addition, in its SEC Form 10-Q for the period ended September 30, 2024, Robinhood stated that its earnings from the Sweep Program were not "subject to short-term interest rate risk" because it "ha[s] the ability to manage [its] net interest spread by adjusting the rate given to users as a result of changes in rates received from partner banks."[15]

21.    Due to these adverse financial incentives, Robinhood paid itself unreasonable, unjustified, and arbitrary fees and passed along unreasonable sweep yields to customers in the Sweep Program.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

22.    The U.S. Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-

---

[12]  Robinhood, *Robinhood Financial LLC Customer Relationship Summary ("CRS")* (Jan. 15, 2025), https://cdn.robinhood.com/assets/robinhood/legal/RHF%20Customer%20Relationship%20Summary.pdf.

[13]  *Id.* at 2.

[14]  Robinhood, Form ADV Part 2A Client Brochure (Mar. 25, 2025), https://cdn.robinhood.com/assets/robinhood/legal/RAM_Brochure_and_Brochure_Supplements.pdf.

[15]  Robinhood Markets, Inc., Quarterly Report (Form 10-Q) (Sept. 30, 2024), https://investors.robinhood.com/static-files/7cc1d0f7-9a8a-4574-8ffd-ebbdea503fb9.

term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[16]

23.    Similarly, the U.S. Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[17]   Thus, an interest rate is reasonable if it is based on a fair market valuation.

24.    In contrast, the Sweep Program paid below-market yields throughout the relevant time period. Since in or around May 2024, for instance, the Sweep Program has paid non-Gold customers a yield of 0.01%.   The following table lists yields paid under the Sweep Program to non-Gold customers since 2019:

| Approximate Period | Non-Gold APY (%) |
|---|---|
| Oct 30, 2019 – Mar 15, 2020 | 1.80% |
| Mar 16, 2020 – May 9, 2022 | 0.30% |
| May 10, 2022 – Aug 10, 2022 | 1.00% |
| Aug 11, 2022 – May 7, 2024 | 1.50% |
| May 8, 2024 – Present | 0.01% |

25.    These yields were significantly below several objective benchmarks of reasonableness:

- **Robinhood's Other Interest-Bearing Programs.**  The sweep yield paid to non-Gold members under the Sweep Program fell far below the yields paid to Gold members since Robinhood began offering them a higher yield in 2022.   For example, Robinhood currently pays Gold members a rate of 4.00% interest.[18]   Robinhood has also begun piloting a "private banking" program, under which it offers, among other things, a 4.00% rate of interest, up to $2.5 million in FDIC insurance, and instant transfers between Robinhood accounts.[19]

---

[16]   Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

[17]   26 C.F.R. §1.482-2(a)(2).

[18]   Robinhood, *Brokerage cash sweep program interest rate (APY)*, https://robinhood.com/us/en/support/articles/cash-sweep-program-interest-rate/ (last visited May 1, 2025).

[19]   Robinhood, *Robinhood Banking*, https://robinhood.com/us/en/banking/ (last visited May 1, 2025).

- **Federal Funds Rate**.  The sweep yields paid to non-Gold members in the Sweep Program were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[20]  The federal funds rate "is the interest rate charged by banks to borrow from each other overnight," and "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."[21]

- **Treasury Bill Rates**.  The sweep yields paid to non-Gold members in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.20% and 3.75%, respectively.[22]

- **Repurchase Rate**.  The sweep yields paid to non-Gold members in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[23]

26.    These benchmarks individually and collectively demonstrate that Defendants' sweep interest rates were, and remain, unreasonable.  Indeed, though Robinhood has represented (a) that the Program Banks "pay interest rates that are determined in part by the federal funds rate," (b) that "[w]hen the federal funds rate fluctuates, so does the rate you receive through brokerage cash sweep" and, accordingly, (c) that "the [sweep] rate would go up if the Federal Reserve announces an increase to the federal funds rate," the sweep rate paid to non-Gold members flattened and subsequently decreased in the face of a fast-increasing federal funds effective rate.[24]

27.    The following chart depicts the sweep yields paid to non-Gold members since October 2019, the sweep yields paid to Gold members since November 2022, and the average federal funds effective rate per month since October 2019:

---

[20] Federal Reserve, *Economy at a Glance – Policy Rate* (Mar. 20, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[21] *Id.*

[22] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (Apr. 29, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (Apr. 29, 2025), https://fred.stlouisfed.org/series/DTB1YR.

[23] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (Apr. 30, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

[24] Robinhood, *Brokerage cash sweep program interest rate (APY)* (July 5, 2022), https://web.archive.org/web/20220705222107/https://robinhood.com/us/en/support/articles/earning-interest/.

1
2
3
4
5
6
7
8
9
10
11



12    28.    As depicted above, between October 2019 and August 2022, the sweep yield

13 offered by Robinhood to both Gold and non-Gold members largely tracked the federal funds

14 effective rate.  Beginning in September 2022, however, Robinhood stopped increasing the sweep

15 yield for non-Gold members, even as the federal funds effective rate skyrocketed to 5.33%, its

16 highest point in nearly two decades.  Robinhood then *decreased* the yield for non-Gold members

17 to 0.01% in May 2024, while the federal funds effective rate remained at 5.33%.  During the same

18 period, the yield paid to Gold members tracked – and at times exceeded – the federal funds

19 effective rate.  In May 2024, for instance, the sweep yield for Robinhood Gold members was

20 5.00%, or *500 times higher* than the sweep yield for non-Gold members.

21    29.    The yields paid to non-Gold members likewise paled in comparison to rates offered

22 by competitor brokerages.  For example, Fidelity automatically sweeps customers into a money

23 market mutual fund with a current 7-day yield of 3.97%[25] and Vanguard automatically sweeps

24

25

26

27 _____

28 25    Fidelity, *Fidelity® Cash Management Account*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/fcma (last visited May 1, 2025).

customers into a money market mutual fund with a current 7-day yield of 3.65%.[26]  Robinhood, meanwhile, pays a yield of 0.01% on non-Gold members' sweep deposits.  The following chart depicts the highest yields offered for the years 2019 through present by competitors Fidelity's and Vanguard's money market mutual funds to which they swept idle customer cash and by Robinhood to non-Gold members:



30.    As depicted above, Robinhood's sweep rate for non-Gold members largely tracked the rates offered by competitors from 2019 to 2022.  Beginning in 2023, however, the difference between the yields paid to non-Gold members and the rates offered by competitors increased dramatically.

31.    The yields paid to non-Gold members are also far lower than the yields paid to Robinhood UK customers under an identical cash sweep program ("UK Sweep Program").  In or around November 30, 2023, Robinhood launched Robinhood UK, which offers customers in the

---

[26] Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited May 1, 2025).

United Kingdom a platform to trade on the United States stock market.[27]  Robinhood UK also offers the UK Sweep Program, under which it sweeps idle customer cash into the same exact banks as the Sweep Program (*i.e.* the Program Banks).[28]  Yet, ***at no additional cost***, customers in the UK Sweep Program currently earn a yield of 4.00% – ***400 times more*** than the yield currently earned by Robinhood's non-Gold members in the United States.[29]  The following table shows the differences between a sampling of the sweep yields offered to Robinhood UK customers and non-Gold members from November 2023 to present:

|  | Non-Gold APY (%) | Robinhood UK AER (%) | Differential (%) |
|---|---|---|---|
| **November 2023** | 1.50% | 5.00% | -3.50% |
| **March 2024** | 1.50% | 5.00% | -3.50% |
| **December 2024** | 0.01% | 4.00% | -3.99% |
| **April 2025** | 0.01% | 4.00% | -3.99% |

32.    As a result of the foregoing, Plaintiff and the Class (defined below) suffered, and continue to suffer, damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

---

[27] Robinhood, *Introducing Robinhood in the United Kingdom* (Nov. 30, 2023), https://newsroom.aboutrobinhood.com/introducing-robinhood-in-the-uk/.

[28] Robinhood UK, *Brokerage cash sweep program*, *Which banks are in our network?*, https://robinhood.com/gb/en/support/articles/deposit-sweep-program/#Whichbanksareinournetwork (last visited May 1, 2025).  Currently, the UK Program Banks are: Goldman Sachs Bank USA, Wells Fargo Bank, N.A., Citibank, N.A., Bank of Baroda, U.S. Bank, N.A., Bank of India, Truist Bank, M&T Bank, First Horizon Bank, EagleBank, CIBC Bank USA, BNY Mellon, Morgan Stanley Bank, N.A., Morgan Stanley Private Bank, National Association.

[29] Robinhood UK, *Brokerage cash sweep program interest rate*, https://robinhood.com/gb/en/support/articles/cash-sweep-program-interest-rate/ (last visited May 1, 2025).

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to the Sweep Programs**

33.     Robinhood agreed to act as the agent of customers in the Sweep Program under the terms of the Sweep Agreement discussed above.[30]  As agent, Robinhood exercised full discretion, management, and control over the cash deposited on behalf of customers in the Sweep Program, including by selecting the Program Banks that received the cash, negotiating the rate of interest to be paid on the Deposit Accounts, sweeping the cash into the Program Banks, and unilaterally deciding the fee it wanted to extract from the interest accrued on the Deposit Accounts.

34.     As agent under the Sweep Agreement, Robinhood was contractually obligated to act in its customers' best interests in paying itself reasonable fees and paying customers reasonable interest rates under the Sweep Program.  In other words, reasonableness was implicit in the Program Documents and governed the sweep interest rates paid to customers in the Sweep Program.  However, Robinhood failed to act in its customers' best interests because, as discussed above, the sweep interest rates were unreasonable compared to several objective benchmarks.

35.     In addition to its contractual obligations, Robinhood owed fiduciary duties to its customers under the Advisers Act as investment advisors and agents with full discretion, management, and control over cash deposited by customers into the Sweep Programs.[31]  In particular, Robinhood was obligated to "serve the best interest of its clients and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."[32] Similarly, as agent and broker-dealer for its customers, Robinhood owed fiduciary duties under California law and under Regulation Best Interest, both of which required Robinhood

---

[30]   Robinhood, *Sweep Program Agreement*, *supra* note 5.

[31]   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[32]   *Id.*

to act in its customers' best interests and prohibited it from placing its own interests ahead of its customers' interests.[33]

36.     However, as discussed above, Robinhood violated its fiduciary duties under the Advisers Act, California law, and Regulation Best Interest, when it enriched itself by paying unreasonably low yields, well below several objective benchmarks discussed above.

37.     Robinhood also owed its customers contractual duties under the implied covenant of good faith and fair dealing, which precluded Robinhood from frustrating and unfairly interfering with its customers' right to receive the benefits of the contract, including by abusing its discretion to set fees or otherwise acting in bad faith.  Beginning in or around September 2022, however, Robinhood suddenly, and in bad faith, revoked the benefits of the Sweep Agreement from its non-Gold members, when it flattened and later dropped the yield paid to non-Gold members to virtually zero while the federal funds effective rate rose and remained at 20-year highs.  During the same period, Robinhood began favoring its Gold members, paying them a rate that increased alongside, and sometimes exceeded, the federal funds rate, even though the same contract, agency, fiduciary and other duties under the law govern the relationships between Robinhood and both Gold and non-Gold members in connection with the Sweep Program.

**Defendants Made Material Misrepresentations and Omissions Regarding the Sweep Programs**

38.     While Robinhood exploited customer cash to its benefit, it falsely led non-Gold customers to believe it would act in their best interests and increase yields alongside the federal funds rate.  Between in or around November 2019 through September 2024, Robinhood's Help Center page regarding the Sweep Program's APY ("Sweep Rate Page") falsely and misleadingly represented that the APY "***would go up if the Federal Reserve announces an increase to the***

---

[33]  *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

1   *federal funds rate.*"[34]  During the same period, the Sweep Rate Page also falsely and misleadingly

2   stated that "the Federal Reserve Bank (or 'the Fed') and market conditions **are the biggest factors**

3   **in APY fluctuations**," and that "[t]he banks in our [Sweep Program] pay rates above the Fed's

4   benchmark interest rate, and **we are committed to continuing to pass this higher interest rate on**

5   **to you**."[35]

6          39.     These statements were materially misleading and omitted material facts because,

7   beginning in or around September 2022, Robinhood flattened the yield paid to non-Gold

8   customers, even as the Federal Reserve continued increasing the federal funds rate and market

9   conditions for short-term interest rates continued to improve.  In other words, despite representing

10  that (a) the Federal Reserve and market conditions were the "biggest factors in APY fluctuations,"

11  (b) yields for non-Gold customers would increase alongside the federal funds rate, (c) the Program

12  Banks were paying rates above the federal funds rate, and (d) Robinhood was "committed" to

13  passing along increasing rates to non-Gold customers, Robinhood refused to increase and later cut

14  to nearly zero the yield for non-Gold customers, pocketing the increasing spread for itself.

15         40.     Robinhood later sought to cover its wrongdoing by removing or revising these false

16  and misleading statements.   ***First***, Robinhood deleted the language representing that it was

17  "committed" to passing along higher rates to its customers.  ***Then***, Robinhood revised its statement

18  that the "biggest factors" in APY fluctuations are the Federal Reserve and market conditions.

19  Today, the Sweep Rate Page states, "The Federal Reserve Bank (or the Fed) and market conditions

20  are factors in APY fluctuations. Changes in fees or charges that Robinhood receives from program

21  banks can also cause the APY to fluctuate."[36]  ***Finally***, months ***after*** reducing non-Gold members'

22

23  [34]  Robinhood, *Brokerage cash sweep program interest rate (APY)*, *What could cause the rate to*
    *change?*                     (Oct.                    4,                    2023),
24  https://web.archive.org/web/20231004034229/https://robinhood.com/us/en/support/articles/earni
    ng-interest/.

25  [35]  Robinhood, *Brokerage cash sweep program interest rate (APY)*, *How are you paying 1.00%*
    *APY\**                     (July                    5,                    2022),
26  https://web.archive.org/web/20220705222107/https://robinhood.com/us/en/support/articles/earni
27  ng-interest/.

28  [36]  Robinhood, *Brokerage cash sweep program interest rate (APY)*, *supra* note 18.

1    sweep rates to 0.01%, Robinhood deleted the representation that yields "would go up if the Federal

2    Reserve announce[d] an increase to the federal funds rate."[37]

3          41.    Through other changes to the Sweep Rate Page and the Sweep Agreement,

4    however, Robinhood continued to mislead non-Gold members about the sweep yield they earn

5    under the Sweep Program.  For example, since in or around November 2024, the Sweep Rate Page

6    has **omitted** the sweep yield paid to non-Gold members under the Sweep Program, even though

7    the Sweep Agreement directs customers to the website to "access the current interest rate on the

8    Deposit Accounts."[38] As depicted below, the change leaves non-Gold customers guessing:

### What does it mean to earn interest?

You'll earn 0.01% Annual Percentage Yield (APY) on your uninvested brokerage cash that is swept to the banks in our program, or 5% for Robinhood Gold members.

Robinhood, *What does it mean to earn interest?* (Sept. 9, 2024)



### What does it mean to earn interest?

You'll earn a 4% Annual Percentage Yield (APY) as a Robinhood Gold member on your uninvested brokerage cash that is swept to the banks in our program.

All accounts managed by Robinhood Strategies also get a 4% Annual Percentage Yield (APY) on uninvested cash that is swept to the banks in our program.

Robinhood, *What does it mean to earn interest?* (Apr. 14, 2025)

21          42.    Robinhood similarly deleted disclosures about the fees it extracts from the interest

22    paid on Deposit Accounts by the Program Banks.  Until in or around March 2024, the Sweep

23    Agreement disclosed that Robinhood earned "up to 5% on an annual basis" on daily deposit

---

27    [37]    *Id.*

28    [38]    Robinhood, *Sweep Program Agreement*, *supra* note 5 at 7.

1    balances in its customers' Deposit Accounts at the Program Banks.[39]  Since then, however, the

2    Sweep Agreement has omitted the cap on its discretionary fee. Robinhood's previous inclusion of

3    this information evidences its materiality, and its subsequent redaction of this information shows

4    its intent to conceal its decision to pocket the increasing spread between the federal funds effective

5    rate and the APY paid to non-Gold customers.  Indeed, in connection with the nearly identical UK

6    Sweep Program, Robinhood still discloses that it extracts a fee "up to 5% on an annual basis" from

7    the interest paid on Deposit Accounts by the Program Banks.[40]

8          43.    Other false and misleading statements have remained constant in the Sweep

9    Agreement and other disclosures since as early as 2019.  *First*, since in or around 2019, the Sweep

10   Agreement has misleadingly stated that "[t]he interest rates paid with respect to the Deposit

11   Accounts at a Program Bank *may be* higher or lower than the interest rates available to depositors

12   making deposits directly with the Program Bank or other depository institutions in comparable

13   accounts, or other options in which you can invest free credit balances."[41]  This statement is false

14   and misleading because, in reality, Robinhood *always* paid yields to non-Gold customers that were

15   far lower than market alternatives.

16         44.    *Second*, the Sweep Agreement misleadingly states that "[t]he interest rates on the

17   Deposit Accounts will be determined by the amount the Program Banks are willing to pay," and

18   that "[i]nterest rates on the Deposit Accounts will vary based upon prevailing economic and

19   business conditions."[42]  These statements are false and misleading because they imply that

20   customers should expect the rates paid under the Sweep Program to reflect market conditions,

21   including prevailing benchmark rates.  The rates paid to customers, however, merely reflected

22

23   [39]   Robinhood, *IntraFi Network Deposit Sweep Program Agreement* (Nov. 16, 2023),

24   https://web.archive.org/web/20231212210807/https://cdn.robinhood.com/assets/robinhood/legal/
     IntraFi%20Network%20Deposit%20Sweep%20Program%20Agreement.pdf.

25   [40]   Robinhood    UK,    *Robinhood    Brokerage    Cash    Sweep    Program    Agreement*,

26   https://cdn.robinhood.com/assets/robinhood/legal/Brokerage_Cash_Sweep_Program_Agreement
     _(UK).pdf (last visited May 1, 2025).

27   [41]   Robinhood, *Sweep Program Agreement*, *supra* note 5.

28   [42]   *Id.*

1  Robinhood's increasing desire to generate revenue for itself and pocket a greater spread between

2  the interest rates paid on the Deposit Accounts and the yield paid to customers.

3       45.    ***Finally***, in its "Product Features Disclosures" document, Robinhood misleadingly

4  states, "The Annual Percentage Yield (APY) paid by program banks is subject to change at any

5  time at the program banks' discretion."[43]  This statement was false and misleading because, in

6  reality, the APY ***only*** changed for customers at ***Robinhood's*** discretion.

7  **CLASS ACTION ALLEGATIONS**

8       46.    Plaintiff brings this action as a class action against Defendants pursuant to Rule 23

9  of the Federal Rules of Civil Procedure on behalf of a Class consisting of all customers of

10  Defendants who had cash deposits or balances in the Sweep Program, excluding customers

11  subscribed to Robinhood Gold ("Class").  Also excluded from the Class are Defendants, officers

12  and directors of Defendants at all relevant times, members of their immediate families and their

13  legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had

14  a controlling interest.

15       47.    The Class members are so numerous that their individual joinder is impracticable.

16  While the exact number of Class members can only be determined by appropriate discovery,

17  Plaintiff believes that Class members number in the millions, and are geographically dispersed,

18  because Robinhood has over 25 million funded customers and oversees $187 billion in customer

19  assets.

20       48.    Plaintiff's claims are typical of Class members' claims because Plaintiff's cash

21  deposits were subject to the Sweep Program and Plaintiff was not a Robinhood Gold member, and,

22  therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful

23  conduct by Defendants alleged herein.

24       49.    Plaintiff will fairly and adequately protect the interests of the Class members and

25  has retained counsel experienced and competent in complex class action litigation.  Plaintiff has

26

27  [43] Robinhood, *Robinhood Product Features Disclosures*, https://cdn.robinhood.com/assets/robinhood/legal/Robinhood_Product_Features_Disclosures.pdf

28  (last visited May 1, 2025).

1  no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks
2  to represent.

3      50.    The prosecution of separate actions by individual Class members would create a
4  risk of inconsistent or varying adjudications with respect to individual Class members that would
5  establish incompatible standards of conduct for the party opposing the Class or a risk of
6  adjudications that, as a practical matter, would be dispositive of the interests of other Class
7  members who were not parties to the adjudications or would substantially impair or impede the
8  ability of such Class members to protect their interests.

9      51.    Because Defendants act or refuse to act on grounds that apply generally to the Class,
10 final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class
11 as a whole.

12     52.    A class action is superior to all other available methods for the fair and efficient
13 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the
14 damages suffered by individual members of the Class may be relatively small, the expense and
15 burden of individual litigation make it impossible for the members of the Class to individually
16 redress the wrongs done to them.  There will be no difficulty in the management of this action as
17 a class action.

18     53.    Questions of law and fact common to the members of the Class predominate over
19 any questions that may affect only individual members in that Defendants act on grounds generally
20 applicable to the entire Class.  Among the questions of law and fact common to the Class are:

21         (a)    whether Defendants violated the laws as alleged herein;

22         (b)    whether Defendants owed fiduciary duties to Plaintiff and members of the
23 Class in connection with the Sweep Program;

24         (c)    whether Defendants breached their fiduciary duties to members of the Class
25 in connection with the Sweep Program;

26         (d)    whether Defendants breached their contractual obligations to members of
27 the Class in connection with the Sweep Programs;

28

CLASS ACTION COMPLAINT                                                     - 19

(e)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(f)    whether Defendants were unjustly enriched by their wrongful conduct;

(g)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(h)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

**COUNT I**

**Breach of Fiduciary Duty**
**Against All Defendants**

54.    Plaintiff incorporates paragraphs 13-32, 35-36, and 38-45 as though fully set forth herein.

55.    During the relevant time period, RHS and RHF were the agents of customers enrolled in the Sweep Program, including Plaintiff and the Class.  RHM owned and controlled RHS and RHF.

56.    RHS and RHF owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

57.    RHS and RHF violated their duty to act in the best interests of Plaintiff and the Class by using the Sweep Program to enrich Robinhood at the expense of customers who were paid unreasonably low interest rates, as described above.

58.    RHS and RHF also violated their duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Sweep Agreement, the Sweep Rate Page, and Robinhood's regulatory disclosures, as described above.

59.    Further, RHS and RHF violated their duty to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Agreement, the Sweep Rate Page, and Robinhood's regulatory disclosures, which were materially misleading and omitted material facts for the reasons described above.

60.     As a direct and proximate result of RHS's and RHF's breach of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

## COUNT II

### Breach of Contract
### Against All Defendants

61.     Plaintiff incorporates paragraphs 13-34 as though fully set forth herein.

62.     Plaintiff and Class members were parties to the Sweep Agreement with RHS and RHF.  The Sweep Agreement set forth the contractual terms and conditions of the Sweep Program. RHM owned and controlled RHS and RHF.

63.     Under the Sweep Agreement, which was incorporated into the Account Agreement, RHS and RHF were contractually obligated to act as agents on behalf of Plaintiff and the Class, and, thus, were contractually obligated to act in Plaintiff's and the Class' best interests in paying reasonable sweep interest rates and extracting reasonable discretionary fees from the rates paid by the Program Banks under the Sweep Program.

64.     RHS and RHF breached their contractual obligations by failing to provide Plaintiff and the Class with reasonable sweep interest rates on their deposits in the Sweep Program and extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the Deposit Accounts.  Rather, the sweep interest rates provided by RHS and RHF were below market and unreasonably low.  As such, RHS and RHF denied Plaintiff and the Class the full benefit of their bargain under the Sweep Agreement.

65.     As a direct and proximate result of RHS's and RHF's breaches of contract, Plaintiff and the Class sustained damages.

## COUNT III

### Violation of the Investment Advisers Act of 1940
### Against All Defendants

66.     Plaintiff incorporates paragraphs 13-32, 35-36, and 38-45 as though fully set forth herein.

67.     During the relevant time period, RHS and RHF acted as agents and investment advisors under the Advisers Act with full discretion, management, and control over cash deposited by customers into the Sweep Program, including selecting the Program Banks and transferring customer deposits to and from the Program Banks.

68.     Section 215(b) of the Advisers Act provides that every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (a) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (b) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

69.     The Sweep Agreement is voidable under Section 215(b) of the Advisers Act because it contained material misrepresentations and omissions in the Sweep Agreement, as described above, in violation of Section 206 of the Advisers Act, which prohibits any investment adviser from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, "to employ any device, scheme, or artifice to defraud any client or prospective client"; "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client"; or "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. §80b-6(1)-(2), (4).

70.     As a result of these violations, the Sweep Agreement should be deemed void pursuant to Section 215(b) of the Advisers Act.

71.     Accordingly, Plaintiff seeks rescission of the Customer Agreement and restitution of the consideration given pursuant to its purported terms.

## COUNT IV

### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against All Defendants

72.     Plaintiff incorporates paragraphs 13-32 and 37-45 as though fully set forth herein.

73.     Plaintiff and Class members were parties to the Sweep Agreement with RHS and RHF concerning the Sweep Program.  The Sweep Agreement set forth the contractual terms and conditions of the Sweep Program.  RHM owned and controlled RHS and RHF.

74.     Implicit in the Sweep Agreement were duties of good faith and fair dealing.  RHS and RHF breached their duties of good faith and fair dealing by (a) paying themselves unreasonable, unjustified, and arbitrary fees and (b) failing to provide Plaintiff and the Class with reasonable interest rates on their cash sweep deposits in the Sweep Program.  Rather, the interest rates provided by Defendants were below market and unreasonably low.  As such, RHS and RHF denied Plaintiff and the Class the full benefit of their bargain under the Sweep Agreement.

75.     As a direct and proximate result of RHS's and RHF's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

### Negligence
### Against All Defendants

76.     Plaintiff incorporates paragraphs 13-32 as though fully set forth herein.

77.     During the relevant time period, RHS and RHF were the agents of, and investment advisors to, customers enrolled in the Sweep Program, including Plaintiff and the Class.  RHS and RHF facilitated the Sweep Program by, among other things, accepting deposits from customers in the Sweep Program and sweeping them into accounts with the Program Banks.  RHM owned and controlled RHS and RHF.

78.     Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Program.

79.     Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable interest rates on their cash sweep balances in the Sweep Program, Defendants breached their duty to act with reasonable care.

### COUNT VI

**Negligent Misrepresentations and Omissions**
**Against All Defendants**

80.     Plaintiff incorporates paragraphs 13-32 and 37-45 as though fully set forth herein.

81.     During the relevant time period, RHS and RHF were the agents of customers enrolled in the Sweep Program, including Plaintiff and the Class.  RHS and RHF facilitated the Sweep Program by, among other things, accepting deposits from customers through their online brokerage platform and sweeping them into accounts with the Program Banks.

82.     Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash deposited and maintained in the Sweep Program.

83.     Defendants negligently made material misrepresentations and omissions in the Sweep Agreement, the Sweep Rate Page, and Robinhood's regulatory disclosures, as described above, all of which were posted on Defendants' Robinhood App and public website.

84.     Plaintiff and the Class justifiably relied on the Sweep Agreement, the Sweep Rate Page, and Robinhood's regulatory disclosures and accordingly deposited and maintained cash balances in the Sweep Program to their detriment.

85.     Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the Class.

**COUNT VII**

**Violation of California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §17200, *et seq.*)**
**Against All Defendants**

86. Plaintiff incorporates paragraphs 13-32 and 37-45 as though fully set forth herein.

87. Defendants' acts and practices with respect to the Sweep Program, as described above, constituted unfair and fraudulent business acts and practices in violation of California Business & Professions Code ("UCL") §17200.

88. Defendants have engaged in unfair business acts within the meaning of the UCL by, among other things, falsely representing to consumers that the sweep yields paid under the Sweep Program would increase when the federal funds rate increase and that it was "committed" to passing along higher interest rates to customers.  In reality, as described above, Defendants abused the discretion afforded to them under the Sweep Agreement and paid customers paltry rates of interest, even as the federal funds rate peaked at a 20-year high.

89. Defendants' acts were also "fraudulent" business acts and practices within the meaning of the UCL because Defendants' representations were false and deceiving to the general public.

90. Defendants' unfair business practices presented a threat and likelihood of harm and deception to Plaintiff and the Class, as Defendants systematically perpetrated the unfair conduct upon members of the public.

91. Plaintiff and the Class reasonably relied upon Defendants' misrepresentations and omissions, which Defendants produced in the Sweep Agreement governing the Sweep Program, on their public website to which the Sweep Agreement referred Plaintiff and the Class to learn material information about the Sweep Program, including the yield to be paid, and in their regulatory disclosures posted on their public website.

92. Defendants owed Plaintiff and the Class a duty to disclose true information concerning the Sweep Program and a duty not to withhold material facts from Plaintiff and the Class.

93.     As a result of the misleading and deceptive business acts and practices set forth above, Plaintiff and the Class suffered injury in fact and have lost money or property, including returns on idle cash swept under the Sweep Program.

94.     Accordingly, Plaintiff and the Class seek appropriate relief under the UCL, including injunctive relief and restitution, and reasonable attorneys' fees and costs.

**COUNT VIII**

**Unjust Enrichment**
**Against All Defendants**

95.     Plaintiff incorporates paragraphs 13-32 as though fully set forth herein.

96.     Defendants financially benefitted from the unlawful acts alleged herein by extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the cash deposits of Plaintiff and the Class and paying Plaintiff and the Class unreasonably low and below-market interest payments under the Sweep Program.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

97.     As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

98.     Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.     Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.    Ordering rescission of the Sweep Agreement and restitution of all fees and other benefits received by Defendants thereunder; and

E.    Such other and further relief as the Court deems appropriate.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 5, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY
ANDREW T. REES
RENE A. GONZALEZ
SCOTT I. DION
ALEX KAPLAN


_s/ Stephen R. Astley_
STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com
akaplan@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545

ADEMI LLP
SHPETIM ADEMI
GURI ADEMI
3620 East Layton Avenue
Cudahy, WI 53110
Telephone:  414/482-8000
sademi@ademilaw.com
gademi@ademilaw.com

Attorneys for Plaintiff

CLASS ACTION COMPLAINT